Good morning, Your Honors, and may it please the Court, my name is Dan Bain, and I along with my colleague, Mr. Currie, will be addressing the Court today on behalf of the appellants from Ursa on Metropole. Are you splitting time? We are, Your Honor. I'm going to take six minutes. Mr. Currie is going to take six minutes, and we'd like to reserve three minutes for rebuttal if possible. Do you want me to cut you off at six minutes? If Your Honor would be so kind, I will try to do my best to maintain my own time. Okay. I'll be addressing the issue of whether Hermosa has a protected property interest. Mr. Currie will be addressing the equal protection claim. Your Honors, the District Court erred in holding that Hermosa does not have a protected property interest and requested residential Ottawa permits because the Avalon Municipal Code, specifically Section 4-4.1703.1, imposes a significant limitation on the discretion of the City's Vehicle Clerk in issuing those permits. As Your Honors are aware, there's two criteria that are included within Subdivision G-1. The first criteria is that the dwelling units be located within the City of Avalon, and the second criteria is that the applicant be either the owner or an occupant of one of those dwelling units. Other than those two... Those are requirements for applying for being eligible, but where does it say that you then are entitled to it? It's based on two parts, Your Honor. The first part is the mandatory language within that section which says, shall be issued, and it does say only where those two conditions... You can't just pluck a phrase like that out of thin air and say, shall be issued. It's part of a sentence. You have to say, what shall be issued? Agreed, and the provision does actually apply. When we read it together, you have it in front of you? Yes. Yes, Your Honor. Point me to the actual language. The actual language is the permit shall be issued, and I'm reading from the second sentence, Your Honor, only where the dwelling... This is, what section again, this is 4-4... It's 4-4.1703, Subdivision G-1. G-1, okay. And it's sort of a dense thing. The permit shall be issued only. Correct, Your Honor. Don't you have to read it in context of the first sentence? Where it says may be granted? You do, Your Honor, and that's exactly right. But in this sentence, the first sentence, the may is dealing with, it's not dealing with the circumstances in which a permit can be issued. It's dealing with how many permits can be issued per dwelling unit. And we cited that the Patru versus Rush case... I'm sorry, I didn't understand what you just said. So in the first sentence, it says one and only one Ottawa permit may be granted per dwelling unit as defined in this chapter. Okay, so that sentence deals with authority to grant, right? No, Your Honor, it deals with the ultimate amount of permits that can be granted, and the circumstances, the criteria in which a permit can be issued or shall be issued is dealt with in the second sentence, which starts with the permit shall be issued only where the dwelling unit is located within the city limits and only to a person who owns or resides in the dwelling unit. I mean, it seems to me the second sentence just narrows the first. You know, the first one says only one permit may be issued. And the second sentence says, and here are some more limitations on additions of a permit. It has to meet these other criteria. But where does it say that permits shall be issued if you meet all the criteria? It says in the second sentence, Your Honor. And let me go about this a little bit. Well, it shall be issued only. Correct. And in the case law that the courts have looked at, and I'll cite specifically a Stouch versus the city of, excuse me, the city of Columbia Heights. And that's an Eighth Circuit decision that this court looked at in Thornton. And what the court looked at there, and that was actually an even less mandatory language in that statute. I'm sorry, which was the case again? It's Stouch versus the city of Columbia Heights. And the statute in that case, Your Honors, stated that the renewal is dealt with the renewal of a license for a rental unit. And so the renewal of the license, as required annually by this code, may be made by filling out the required renewal form furnished by the building official to the owner. Or, and by paying the fee. And it says such renewal or registration may be made only where there has been an inspection within the last two years. And the Eighth Circuit in that decision looked at all of those, including the two uses of the phrase may, which is a permissive language, and also looked at only, and said that those are the only three criteria that are included anywhere in that statute that guide the issuance of the permits for renewal. Much like that case, here we only have two particularized criteria that the city can look at to determine when a permit should be issued. And that is the residence requirement and the ownership requirement. And the court said the absence of any opened-ended discretionary factors in that case was an indication that, other than the two particularized factors, the city had no discretion to deny the permits under those circumstances. And that's what we have here. We have two factors that are specifically included in the code. Beyond those two factors, there's no other indication through objective criteria or otherwise that they can... But how do you get past the may in the first sentence? I get past the may, Your Honor, and this is the Patru versus Rush case that we cited in our brief. And the court there looked at it and said, in context, the first sentence deals with the number of permits that can ultimately be issued. And it's a recognition in the statute that you may or may not get a permit depending on whether or not you meet the specified criteria, which are illustrated in the second part of the statement. So the may is not discretionary. And if Your Honor looked at the other code sections that are included within the Avalon Municipal Code at Section 4-4.1703, the other code sections dealing with commercial permits, for example, or temporary permits, they all start with the statement may as well. But the difference between those code sections and the one at issue is they contain several open-ended discretionary factors that give the city council and or the permit official various grounds and discretion for determining whether or not to grant or to deny the permit. And they also allow the officials to add additional conditions in addition to the factors that are enumerated in the code. This particular provision doesn't include any of those types of provisions. Just simply two particularized factors. Other than that, it's completely silent as to any other factors that the city could consider. And the Court in Wedges-Ledges of California v. City of Phoenix also made the same statement. And in that code section, there was the shall, followed by the conditions that the applicant had to meet in order to be entitled to the permit. And in that case, also the Ninth Circuit looked at and said, the absence of any... I think you're well past your six minutes. Thank you, Your Honor. Thank you, Your Honor. Equal protection, slightly differently. You realize the District Court held that the sole issue before the Court is whether plaintiffs have a constitutionally protected property interest in the requested Ottawa permit, which is a threshold requirement to plaintiff's claims. That's not accurate. It's not accurate that you need a property interest for an equal protection claim. Your Honors, we're focusing on the legality of that statute and whether it requires a permit. The evidence is that a permit was never... There's no evidence that a permit was ever not given. If you met the test of, number one... I'm sorry, I got confused in all those negatives. And... You said okay without knowing what I was... Right, so as applied by the city, there was no discussion. You understand what I just said? I had no idea what you... You used two negatives and I didn't understand what you said. That's my specialty. Why don't you try saying it in a positive way? The city... You didn't listen. You weren't listening. The city does not use anything other than those two factors. If you meet both of those factors, they approve it without exception. What does that have to do with equal protection? Because the time when our client went in with a request for 32 permits, he was treated differently than every other applicant had ever been treated before. How many other applicants have applied for 32 permits? There's no evidence that anyone came in with 32 permits. There is evidence that multiple property owners who owned multiple units were granted permits. There's also evidence that if the 32 residents of those 32 units had gone in and applied, and even today, that they would be given permits. That doesn't help you at all. That doesn't help you at all. The city can easily do a rational distinction between saying, we will give occupants, people who actually occupy the dwelling, a permit. We will not give the landlord a permit. That's not an equal protection argument. That's a quibble. If you're pointing to the city's ability to control and limit the number of permits, you're not limiting the number of permits. I'm not pointing to anything. I'm saying that they treat owners and occupiers differently doesn't cause anything like an equal protection problem. Owners and occupants are different, and I can think of about 75 rational reasons why a city might treat owners and occupiers differently. And all you need is a rational reason. One of those 75 will do. So saying, oh, the individual occupants could go in and get permits, doesn't help you at all. It sort of weakens your case by making it seem silly. Well, I think it's a strength of the case because it shows that limiting the number of permits Well, only for you. Unfortunately, I'm the one sitting here deciding the case. You're going to have to persuade me why it makes a difference. I mean, maybe my colleagues disagree with me on this. Maybe you'll get them, but you're not going to get me by saying, oh, they are the same. I don't get it. How can you maintain that the city may not rationally treat owners and occupants differently? But they're also treating owners and owners differently. That's a different argument. I was focusing on your statement, which you made, hoping to advance your argument, that the owners, the occupants, could now go in and get a permit, and that they constantly issue permits to occupants. And even in this case, the occupants could go in and get 32 separate permits. So obviously you are making an argument, or you were making an argument, that the city is irrational in treating owners and occupants differently. And I was ridiculing that as being just the silliest thing I've heard all week. But you can go ahead and persuade me otherwise. Well, as to what you consider less silly, I think, is the other owners who own multiple units were always given permits in the past, without exception, over the counter. Were they similarly situated to your client? In the sense that they intended to let the renters of their condos use the permits, or use the Ottawa's with the permits. Yes, they are. And did they ask for 32, or did they ask for... They didn't ask for 32, and there's no evidence of what the second biggest one was. But there are multiple, and the city all testified, yes, multiple, owners of multiple units were given them. Without exception, all they had to show was the test of... When you say there's evidence, why don't you tell us what kind of evidence there is. I take it you don't have actual permanent applications with an approved stamp on them. Well, this was never a written application situation that was over the counter. They walk in... I'm sorry, this is a no to my... No. You're answering no? I take it you don't have a written application with a... What do you have? We have a testimony by both people involved, the Dudley Moore, excuse me, the clerk of the city who issues these over the counter, Dudley Morant, and the owner of the Hermosa Hotel, Mark Milan, who came in and said, I would like 32 permits, showed how he had 32 dwelling units under the code, and that they were in the city. Those are the two criteria, and he was told you'll never get these. What evidence do you have about other owners getting multiple permits? What is it? You said there's evidence. Look at two EOR, we call it, which is kind of an unfortunate designation, page 136 and 139, and look at Scott Campbell's testimony. Instead of using initials, why don't you tell me what it is? Page 136, Scott Campbell testifies over a number of six or seven... Page 136 of the excess record? Yes, sir, and 139 also. Scott Campbell is the city attorney, and he testifies that... Okay, hold on a second, let me get that. 136, okay. This is a page of testimony, right? Yes, Your Honor. Okay, give me a line. Page 139, I'm sorry, line 20 through 25. Okay, now, let me give it a little move to 139. Lines what? Bottom of the page, line 20 through 25. Okay. And where he talks about it being an over-the-counter is on page 143, line 13 through 144, line... Six. So this is who being asked? This is the city... The first testimony was the city attorney. The second testimony is Robert Kennedy, one of the city council people. Curry is the city attorney? Scott Campbell. Oh, I'm sorry, Mr. Curry is asking the questions, and the answer is being given by Scott Campbell? Yes, sir. Okay. So it's that difference... I'm sorry, so that's 139, and what other page? Your Honor, right now, I would just like to sum up, but... I have a question. We have plenty cited in the record. I have a question, and I think you should complete your answer to Judge Kuczynski's question, and then I have a different question. Okay. There are other passages. But that's the one I have marked in my notes. Okay, so would you agree that residential auto-ed permits were issued to some owners of multiple dwelling units pursuant to G-1 before the urgency ordinance? How does that help you? It doesn't say multiple... I mean, there's an exception for owners who actually are occupiers as well. That's correct. So he says, so phrased, the answer is yes. How does this support the proposition that owners have gotten multiple permits for their units? Because... It's not a trap. I'm just trying to understand. No, no, I understand. I'm trying to understand. I understand what you're saying. To me, the question could... I read that testimony. ...easily be answered by saying, yes, owners have gotten permits because they're entitled to it. If they are owner-occupiers, they're entitled to a permit, and yes, the answer would be yes. Where does it say that they've gotten multiple permits? Is there any place in the record? I mean, you sort of breezily said there is evidence in the record that multiple... You don't have a citation right now. That citation was the one that I thought made that point the best. If we don't read it that way... And I understand what you're saying. ...then do you still have an equal protection argument? Yes, I believe we do. There's no evidence that anybody was ever denied for any reason if they met those two criteria. And this time... Why would a negative like that be evidence of that be put on the record? I mean, you have the burden of presenting evidence. The absence of evidence doesn't help you any. Well, we asked a lot of questions, and we put a lot of evidence before you. You didn't ask the question, did you ever issue multiple permits to owners? That question doesn't appear to exist. I thought this was that question. You're reading it differently than me, and I understand what you're saying. Are you Mr. Curry? Yes, sir. Ah, well. Okay. Okay, I have a question. So how does this... How does the urgency ordinance that was passed, which singles out your client by name and his particular application play into your equal protection argument? Only as evidence. Under Gerhard, we need to show intentionality treated differently and without a rational basis. And I believe that being told by the city clerk you'll never get these by the city council multiple times. And then the urgency ordinance referring to you by name six times shows the intentionality version. Does it at least create a tribal issue back there? I would believe so. You don't need to show ill will, as you know. You only need to show they intended it to take effect with this person. That's the part that I find most compelling. The due process argument troubles me because the statute seems ambiguous. And then the fact that your client was singled out in an urgency ordinance for a moratorium with exceptions for multiple other people is also troubling. But I don't see that argument so clearly made. Well, I believe it reflects that the city as well had the interpretation that my colleague was saying that the statute said and believed that they had to do something because that's what the statute says. And all the evidence here is that the two conditions were met and someone would be given a permit. So the only time it didn't happen was coming in with 39. Is there any evidence in the record that there were never any commercial applications that were granted? Because it would seem equally plausible to me that everyone else who wanted to get 30 or so auto permits for their hotels complied with the commercial section, which is clearly stated saying if you're a hotel owner, you have to go through this procedure. And it was only when your client chose to treat himself differently by saying I'm a hotel owner, but I can read this statute in a way that lets me shortcut this, that it became apparent that there was a potential flaw here. That's certainly what the city said at the time. I still think it creates a tribal issue of fact. I also believe if you look at the statute involved and realize that the units here had a sink and a kitchen and were assessed a residency tax, which is why they were considered dwelling units under the residential code, that they thought they had a problem. I don't think they had a problem. I think they needed to actually issue those permits at the time. And I was asked how that impacts the equal protection. I don't think equal protection needs to prove any entitlement under the code, but as applied by the city and everyone, and sort of admitted by doing an urgency ordinance that specifically targets your person, clearly they felt that's what that code section said too. So I do think at the very least, very minimum, there are many tribal issues of fact here. And I'm way past my time. Let me ask you a slightly different version of the question I asked earlier. Is there any indication, evidence in the record, that multiple unit owners applied for these permits under the residential permit process rather than commercial? The questions I was asking were not about commercial. The question I asked is, is there evidence in the record? I don't want your personal narrative. They were residential. I mean, you have a commercial section, and the question you asked here doesn't say anything about which. Oh, I'm sorry, this does refer to residential. Yeah, you can see before that it's residential. But is there any evidence that others applied for multiple permits under the residential? That's the citation I have right here. That's it. If I could turn around and return you to page 136. Okay, what line? Line 1 through 11. And what does it say? As in the staff report, there were some residents that had multiple residences. Who is that talking? That's a question. Scott Campbell, the attorney. City attorney. Okay. You didn't want me to read it into the record? Oh, actually, I'm asking you what does it say? What do you think it says? It says that there were some residents that had multiple residences, multiple dwelling units. So one person could have five dwelling units and five golf carts associated with each dwelling unit. Okay. So do you follow, I don't, do you follow under commercial or do you, they do it by dwelling unit, not commercial versus residential. They do it, they define it by dwelling unit. At first summary judgment below, the court found that dwelling unit was more specific than lodging and therefore found that if you have dwelling units, wherever they are, they get a residential permit, not a commercial permit. And the other condos were getting the same residential permit. So the statute's set up by dwelling units. When they talk about commercial, they're talking about people that rental, that rent. They're talking about hotels that don't have kitchens and aren't considered dwelling units that may be renting theirs, but those are under commercial. There's two ways to get a permit. And one is the statute we're going under. Another is a commercial statute. But the commercial statute covers your client as well. Well, we weren't going under it. The city certainly argues. You were choosing not to. Right. The city certainly argues that, well, maybe you should have been going under the commercial. But again, to your question, they were bothered enough about it that they felt they had to do an urgency ordinance because they felt our interpretation apparently had some merit. Okay. Thank you, Your Honors. Okay. We'll hear from the City of Avalon. Good morning, Your Honors. James Jardine for the City of Avalon. May it please the Court. Unless the panel has any specific issues or questions they'd like me to respond to, there were a couple topics that I wanted to begin by addressing. The first is that subsection G, which we've been discussing, that contains the Ottawa permits provision. If we look down at subsection G-5, there's an explicit reference there which indicates that any person who wants to provide a golf cart for a rental purpose needs to comply with a separate provision. I'm sorry, Your Honor. I'm looking at 5. Where in 5 are you? It's under G-5. It's just one sentence, I believe. Oh, I see. Subsection G. I'm looking at page 367, 368 of Excel's record, and there don't seem to be contiguous pages. It appears in multiple portions. The reference I have is in volume 3 at page 252, which is where section 17 is set out. Okay. What are you looking at now? I'm on page 252. And the specific site I'm looking at is page 259, Your Honor. That's 1703, subsection G. Why did you say 252? Oh, I'm sorry. That was the first note I had. That's the start of that reference. My apologies. So, G what? G-5. 5. This is close to the bottom there. Ottawa permits may be granted. Okay. Is this it? Yes, Your Honor. That's it. Okay. So go ahead and make your point. What does it say? It refers, if the Ottawa is going to be used for a commercial purpose, it refers us over to a different portion of the statute, 51103. And that's the portion of the statute that includes language saying that the operator of any hotel, motel, or other type of lodgings for consideration has to apply for a commercial rental Ottawa permit if they want to make the Ottawa an amenity as part of the consideration paid for lodging. And that's really the provision of the Avalon Municipal Code that Hermosa was required to comply with if they did want to obtain 32 Ottawas at once to provide to their customers. And it's a very different process than subsection G. So your position is that this was covered by the prior ordinance, the existing ordinance. Why pass the urgency ordinance? That's a really good question, Your Honor. Thank you. I love being told that. You know, this makes me feel so good. I believe that... Do you think it was a smart question, too? Go ahead. Just answer the question for crying out loud. Why pass the ordinance? I think the concern was that there might be additional hotel operators on the island who would attempt to exploit the same perceived loophole and apply for multiple residential... Why didn't you just tell him to apply under Section 5? It wouldn't be accepted under Section 1. So he needed to apply under Section 5 and follow the 511. Or was it that you weren't going to grant him any permits anyway, and that's why the city passed the urgency ordinance specifically targeting him? No, not at all, Your Honor. The concern was just the sheer number of golf carts that were involved here. Thirty-two golf carts would have been immediately added to the city streets, and the primary concern there was the issue of parking 32 golf carts at one address that would require off-street parking. But I thought there were 32 separate dwelling units, so these 32 separate dwelling units where they'd be parked. I mean, I guess, so you're saying you wouldn't have granted him, regardless of the procedure he followed? No, we're not saying that, Your Honor. We don't know because he didn't apply under the correct procedure, so the city council was never permitted to... Well, now you did this urgency ordinance targeting him, and now you're not going to grant any to him. Well, the only thing that the city is not going to grant are residential golf cart permits to a hotel operator. That was the only concern that was raised in the urgency ordinance, and the reason the ordinance was passed is so that the code could be amended to clarify it and remove any ambiguity so that the city wouldn't be faced with this particular situation again. The concern was that if we didn't do this, that the other owners of hotels on the island may suddenly begin applying for multiple residential golf cart permits, and we would have no way to regulate that. The residential permits are addressed very differently from the commercial rental permits. There's a hearing process for the commercial rental permits that doesn't apply to the residential permits. I know, but did you need the urgency ordinance to do that? Couldn't you have just said, no, this is 32, and you're a hotel. Apply under Section 5. I think that we did need to enact the urgency ordinance because the HRMOSA was very insistent that it was entitled to residential permits. They were very explicit in their letter to the city. Well, they do seem to fall under both because they come within the definition of dwelling units with the 32 separate dwelling units, right? Because they are dwelling units. They have kitchen facilities and all of that. Well, they're not separate. They're just part of the hotel, but they are dwelling units. That's correct. I thought, I mean, they're owned by the hotel, but aren't they separate units? It's one large building, Your Honor. There's someone back there shaking his head violently. I think that's probably Mr. Milan. Which is it? And I would defer to his knowledge. He is the owner. But the issue was the concern regarding the parking. There are portions of the record where Mr. Milan admits the fact that he didn't have sufficient off-street parking for all 32 of these autoettes. Where does he say that? He would have to apply. Where does he say that? I believe that's in Mr. Milan's, it's in his deposition testimony, which is contained at I've got it right here, Your Honor. Maybe you can read it to me and tell me what pages of the record it is. I'm sorry, Your Honor, I don't have the reference right now. And you're saying that he said they were all in one building? They would all have to be parked at the same address, Your Honor. It's just one address. You're saying that's what he said? And you can't tell me where he said it? I can't, Your Honor. And Your Honor, the only reason that Mr. Milan is specifically identified in the urgency ordinance is because Mr. Milan's letter on behalf of the Hermosa was what brought this issue to light. So the issue had been presented, and it's just part of the recitals to lay forth the record for how this issue has been presented to the city council. Is it common for the city ordinances to mention a single resident by name when they're enacting an ordinance? If it were addressing an issue raised by a specific... Does it commonly do that? I don't believe so, Your Honor. No. No. But again, to find that there is an equal protection violation, the Hermosa would have to show that it's been treated differently from other similarly situated applicants. And the problem here is that there are no similarly situated applicants. There isn't another hotel on the island that has... Well, opposing counsel asked in this question at some length insists there is evidence on the record that other multiple dwelling owners were in fact granted multiple permits. Is there such evidence on the record?  The best evidence that we have to address that is actually at page 250 of the excerpts of record. And this is a spreadsheet that identifies all of the hotels on the island that have dwelling units included within. A spreadsheet? Looks like a table to me, but... Okay. This is the... I see. Well, I had no idea there's so many hotels on Catalina. So what we would expect... Anyway, so tell me what this does. What this shows us is that for the homes that... Rather, for the hotels that do include dwelling units, if Hermosa were correct, what we would expect to see is instances where, for example, we have four residential units, four carts registered, and only one owner holding all of those auto permits. But that's not what we see. What we see... Wait, now, does residential unit mean dwelling unit? Yes, Your Honor, it does. Okay, El Torado Terrace, four dwelling units, four registered golf carts, one owner, three renters. Yes, and what that means is that those four carts are registered to one owner, and then three long-term renters who qualify as residents under the code and are entitled to a residential auto permit. So what we see... Same is true of Hermosa. Well, this is... Yeah, Hermosa is just below there. And at that time, they had eight carts registered. It's one owner and seven renters. So this doesn't suggest that the city is handing out residential permits to owners of other hotels, simply not doing it for Hermosa. What it confirms is... So if we look at the two right-hand columns, there should be equal numbers, right? So it means that, like for example, there are eight, they should add up one owner and renters, the number of people actually getting permits. Yes, the far right column should add up to the number in the second. In the second column. Yes, Your Honor. And seems to in every case, right? It appears... Yeah, that's right. You... This is a disconnected page. Tell me what it is. This was in the record? This is part of the record, yes, Your Honor. I mean, to me, it's disconnected. I don't know how it got here. So this was authenticated as part of the record in this case? Yes, Your Honor. And your view is this contradicts opposing counsel's presentation that multiple dwelling owners were issued permits over the counter for multiple units? Yes, Your Honor. And one other... What do you make of that answer that he cites as being his best piece of evidence? Did you follow along? I attempted to, Your Honor. I believe he was talking about the testimony where there was a reference to an owner who had five separate residences and five golf carts, one registered to each residence. This is page 136. Yes, Your Honor. Yeah, what do you make of that? I think that's a different situation than what we're addressing here. Number one, we don't know that the individual in question is the operator of a hotel, which would be addressed in a different fashion. It may be one person who simply owns five different residences. And that doesn't raise the same concerns if we have, for example, five carts at one address, one physical address. If it's five separate addresses, then there's less of a parking issue because those carts are spread out. They're not just located at one address. So going back to this sheet, did you prepare this? I did not prepare this. A member of city staff prepared this, Your Honor. OK, and the honor says Hermosa Hotel and Carolina Cottages? Yes. Cottages can know separate buildings, right? It might be separate buildings, but they're all at the same address, Your Honor. Well, right. But if it's separate dwelling units, wouldn't they be able to park their cart in front of their unit? That's not in the record, Your Honor. We don't know that. And the larger concern about the sheer number that were being asked by Hermosa, this was unprecedented. We have testimony from the vehicle clerk himself, Mr. Dudley Moran, who stated that he had never received a request like this. Couldn't recall any occasion when he had. Is it just the volume? I mean, what if the owner had come in, taken over the course of 30 days, come in once a day and said, here's my dwelling unit and I want a permit for it? And the next day came for another one and the next. I mean, is it just the fact that he decided to do 32 on one day that makes this an issue? I think that is part of it. I understand the point of your hypothetical. But I think the other concern is the use for which these golf carts were intended. They're not intended for residents who are living here long term, who are going to be going to work, to the grocery store, etc. These are intended for transient visitors who are just going to be on the island visiting. So there are different standards that the city applies to that type of permit for the simple reason that we don't know who your long term visitors are going to be. They're not residents here. They're a different concern. And in fact, that was testified to by Bob Kennedy, the mayor of Avalon. That was one of the driving concerns behind the issuance of the urgency ordinance was the fact that if all of the hotels suddenly applied for residential permits for their dwelling units, you would have, in effect, an increase in the number of rental autoweds available for the city in 51106, so it's just a different concern that they had. Thank you. Unless the panel has any further questions, your honor, I don't have anything more. Thank you. You went way over your time. If you'd like to take a minute for a bottle. I think you were on negative numbers. Thank you, your honor. Briefly, city's council is addressing this dichotomy between residential and commercial and saying that the code doesn't allow residential units to be used for transient guests. And your honor, if I could point you to Avalon City Code section 1707 D1, which is in our supplemental brief attached as part of the addendum. I'm sorry, it's attached to your what? It's on page 35 of our supplemental brief. It's the addendum containing the city codes. Excuse me, our reply brief, your honor. Yeah, I was looking for a supplemental brief, I have no idea what you're talking about. Page 35, you said? Page 35, your honor. It's subdivision D1, which is in the middle. My name's at 32. I see your appendix, okay. What code provision are we looking at? So it's 4-4-1707 subdivision D1. Password permits, okay? Yes, your honor. So if you go to D1, in the middle of the page says Auto Web Permits. In the middle of that, again, very dense paragraphs. It says notwithstanding section 5-11.03. Is your honor referring, your honor? I'm sorry, I don't see notwithstanding in that section. Is it in the middle of this? It is, it says notwithstanding section 5-11.03. Okay. The owner of a rental unit in a residential dwelling who is otherwise entitled to the permit may grant use of the Auto Web without separate charge to any occupant of the rental unit during the rental period. That provision says that an owner of a dwelling unit, like Mr. Milan, who obtains a residential dwelling unit permit, can rent that unit out and provide an Auto Web as part of that occupancy during a rental period. So this commercial residential dichotomy that the city's trying to build isn't just- I'm sorry, how does this help you? Mr. Jarzin was saying that in order to, under the city code, as the city sees it, in order to be able to lease out a dwelling unit to a transient occupant, you have to get a commercial permit. Well, they pointed to a section that says, look, if you are that kind of operator, you have to apply in the commercial section.  5-11.03 only speaks to hotels with lodgings, not to actual dwelling units. So lodgings is a broader term under the code. Dwelling units is a specifically defined term that deals with residential units. So yes, you could have a hotel that would- And where's that distinction? So the distinction is in section 5-11.03 that lays out the criteria for a hotel to apply for and obtain commercial Ottawa permits for lodgings for the hotel. So for units that don't- Go ahead. Units that don't otherwise qualify as residential dwelling units. And that's the distinction we have here, is all the units that Mr. Milan applied for permits for were residential dwelling units. He was not applying for permits for regular hotel rooms under the code, which would then implicate 5-11.03. These were solely residential permits for qualifying dwelling units. And this- Didn't you just say a dwelling unit's a subset of a lodging? It would be, a more specific subset, Your Honor, yes. So if you have to have this commercial permit for a lodging, the fact that your lodging would also qualify as a residential dwelling, a dwelling unit, and then take the residential out, it just says dwelling unit. And it's being used by transient and non-transient occupants, not people who are long-term renters there that become residents. How do you just avoid the commercial? Even though that would, on its face, apply to you, and anybody else applying for commercial permits would be following that. He becomes a class of one because he came in and wanted to be under the dwelling unit provision? I- No, Your Honor. It's kind of gotcha to me. And it's not, and the reason that I say that is you can reconcile the two provisions. So there are circumstances where you have condominium complexes that also are vacation rentals that apply for these same residential permits to provide to vacation renters that come into town. And what the district court did is it reconciled the commercial provision, 5-11.03, with the dwelling unit provision to read those two sections together to say, if the hotel room doesn't otherwise qualify as a dwelling unit, it has to apply under the commercial code section. If it does qualify as a residential dwelling unit, he can apply under the section 17.03 G1 section. And in that way, those provisions can be reconciled. So you're not ignoring either 5-11.03 or the residential code section. So the dwelling, so maybe you can straighten this out. So are we talking about separate dwelling units and not rooms in a hotel? They are separate dwelling units. They're 32 separate cottages, is what Mr. Milan would call them, that are separated from the actual hotel building itself. And to address one point, Your Honors, we're asking about this one fail swoop of 32 permits. If the occupants themselves, still today, all decided they wanted to go in and request a permit for each one of those dwelling units, they could get them over the counter on the spot. Only if they were occupants. If they are renters, by the week or by the day, they couldn't do it. Any occupant could get a dwelling unit permit, Your Honor, under the code. That's not the way the code reads. The code says you have to be an owner or resident of the dwelling unit. An occupant wouldn't necessarily qualify as a resident. Because then it goes on to say if you're a transient or non-transient occupant, the owner can make the permit available to you. And that's correct. I apologize, Your Honor. But the code does allow both transient and non-transient occupants of those units to use those permits. And the difference being someone's considered transient if they're there for less than 30 days and non-transient if it's more. So if you're there for a month or two months for the summer, you're a non-transient occupant, but does that make you a resident? But it doesn't make you a resident, but you still can use the permit. So if the owner got the- Right, but you could use it, but that doesn't mean you can go in and get it. No, no, Your Honor. The owner still has to go in and get it. Correct, Your Honor. So you overstated when you said they all could go in. I did, Your Honor, I apologize. You knew you were overstating. I didn't mean to overstate. I did after I said it. The whole point was that, oh, well, they all can come in. Obviously, they can't all come in. Well, residents of those units- If there are residents in all those units, but there are not residents. If there are residents in all those units, Mr. Milan wouldn't be interested. They could all go get their own permits, and that would be the end of it. The whole point here is for him to have the auto ads to rent out with the dwelling units. So people can come in, and they get the unit, and they also get an auto ad to drive. That's the whole point. That would be the point. I'd only disagree with Your Honor. There are residents, and the number fluctuates depending on what type of year. Certain times of the year, there are residents. So he's been issued up to 17 Ottawa permits for those units to the actual residents themselves. The only point that I'm making and trying to make, Your Honor, is that if there were residents in all those rooms, the city would still have to issue permits for every single one of those 32 units. The difference here is that Mr. Milan is asking for the permits to be issued directly to him as part of the application. So the justification that there's going to be an overabundance of auto ads at this particular location, that could still happen. It would just be the residents, and if Mr. Milan has to rent all of those units out, he will, in which case there's going to be the same impact on parking. That's the only point I was trying to make, Your Honor. If that were easy to do or profitable, he would have done it by now. Obviously, he wants to do it this way because it's advantageous for him to do it that way. Correct, Your Honor. Don't tell us that there's no difference. Obviously, there's a difference. Anyway. Thank you, Your Honor. You will stand submitted. Thank you. I had a minute left, Your Honor. Could I respond very briefly? You're actually in negative numbers. You're in negative. What do you want to respond to? I wanted to provide Judge Morton with the reference that I had been talking about earlier in the options part of the issue. I did find it. Okay. Okay. You can do that much. Okay. But you were, when the number turns red, the little dot turns red, you're on borrowed time. Thank you, Your Honor. It's at page 205 of the excerpts of record. It's Mr. Milan's declaration. It was not his deposition, which is why I didn't find it. It's paragraph 12. What does it say? It says, had the Hermosa been issued the 32 Ottawa permits in March 2012, I would have immediately begun looking for off-street parking for the Ottawa. With certain modifications, the Hermosa Hotel property has sufficient space to provide off-street parking for the 32 Ottawa permits. Furthermore, and based on my research and investigation, i.e., talking with lot owners, etc., there are alternative lots around the city that I could lease to provide off-street parking for the 32 Ottawa. Thus, had my Ottawa application been granted by the city, I believe it is very likely that I would have been able to locate off-street parking for the 32 Ottawa within the five-year expiration period set forth in the urgency ordinance. That's the testimony that I was recalling when I made that representation to you. Thank you, Your Honor.
judges: Kozinski, Wardlaw, Bencivengo